UNITED STATES of America, Plaintiff-Appellee,

v.

Samuel DeWitt CRENSHAW and David Allen Gordon, Defendants-Appellants.

UNITED STATES of America, Plaintiff-Appellee,

v.

Dennis Leo LEHMAN, Defendant-Appellant.

Nos. 82–1008, 81–1782 and 82–1016.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 3, 1982.

Decided Feb. 11, 1983.

Beverly Johnson, Tacoma, Wash., for Crenshaw.

Monte E. Hester, Tacoma, Wash., for Gordon.

Allen R. Bentley, Asst. Federal Public Defender, Seattle, Wash., for Lehman.

C. James Frush, Asst. U.S. Atty., Tacoma, Wash., for U.S.

Before KENNEDY and SKOPIL, Circuit Judges and JAMESON,* District Judge.

JAMESON, Senior District Judge:

Samuel DeWitt Crenshaw and David Allen Gordon appeal their conviction for bank robbery. Dennis Leo Lehman, tried separately, appeals his conviction for aiding and abetting the robbery.[1]

### I. *Factual Background*

The manager of a small rural bank in Belfair, Washington, received a call from a man representing himself as an attorney. It was agreed that the attorney would come to the bank later that day with two clients. Shortly before closing time two men arrived and told the manager they were waiting for their attorney. Just before the bank closed the manager received a phone call from a woman claiming to be the attorney's secretary, who said the attorney had had car trouble, could not make the meeting, and

---

* The Honorable William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation.

1. The three appellants were charged in a single indictment—Gordon and Crenshaw with armed bank robbery, and Lehman with aiding and abetting the robbery—all in violation of 18 U.S.C. §§ 2113(a) and (d) and 2. The district court granted Lehman's motion for a severance and he was tried separately. All were convicted in jury trials, and each was sentenced to imprisonment for 25 years and fined $10,000. Their appeals were consolidated.

wanted the men to put their money in a safe deposit box overnight.

As soon as the bank was closed, both men drew handguns and ordered the employees into the vault. The employees were ordered to place all the money in a trash can liner. A total of $120,890.00 was taken. After the robbery witnesses saw two men with a suitcase crossing a field toward the local airport. A small aircraft was then seen taking off in a southerly direction.

Two weeks later Gordon, Crenshaw, and Lehman were arrested in Sacramento. The airplane, which had been traced to Lehman, was seen landing at the Sacramento airport. Lehman and Gordon were questioned in a nearby restaurant. Gordon was arrested for carrying a concealed weapon. A loaded pistol, matching the description of one of the robbery weapons, was taken from him. Lehman was released but later arrested at the airport. Lehman described the two men who had accompanied him.

While Lehman was held at the airport, FBI agents found a man matching the description given by Lehman. The man identified himself as "Mr. Rudd" and denied knowing Lehman. In a subsequent search of the aircraft a personal phone directory of Lehman's was discovered, which, when compared to an address book found in "Mr. Rudd's" shaving kit, revealed several names and numbers which coincided, including that of Lehman's mother. "Mr. Rudd" was arrested and turned out to be Crenshaw. After discovery of a Red Lion Inn room key in Crenshaw's pocket, it was determined that the three appellants had occupied rooms at the Red Lion Inn in Redding, California.

## II. *Crenshaw and Gordon Appeals*

Crenshaw contends that (1) the FBI's seizure and pat-down at the Sacramento airport amounted to an arrest without probable cause in violation of the Fourth Amendment; (2) the affidavits in support of the warrant under which the FBI searched his motel room were not sufficient to establish

probable cause; (3) statements made by the prosecutor constituted misconduct requiring a mistrial; and (4) testimony was admitted which should have been excluded because its prejudicial effect outweighed its probative value. Gordon also argues that (1) prosecutorial misconduct requires reversal; and contends further that (2) in-court identification testimony was so tainted by impermissibly suggestive pretrial identification procedures that he was deprived of due process of law; and (3) the errors and instances of prosecutorial misconduct when examined cumulatively deprived him of a fair trial.

■ We find no merit in any of these contentions. First, applying the factors outlined in *United States v. Booth*, 669 F.2d 1231, 1236 (9 Cir.1981) and *United States v. Bautista*, 684 F.2d 1286, 1292 (9 Cir.1982), we conclude that the determination of the district court that Crenshaw was not in custody during the initial FBI contacts in the Sacramento airport is not clearly erroneous. There were facts sufficient to support the district court's conclusion that Crenshaw voluntarily permitted the search of his shaving kit, thereby giving up his right to Fourth Amendment protections for his privacy interests in its contents. The record discloses no evidence that the agents led Crenshaw to believe he was under arrest. See *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). Similarly, the record discloses no evidence that the FBI agents did anything to lead Crenshaw to believe he was under arrest when the pat-down search, to which he had consented, was conducted.[2]

■ In arguing that the affidavit in support of the warrant to search his motel room was inadequate, Crenshaw reasserts his claim that the pat-down search which produced the room key and the subsequent arrest were not based on probable cause. We find this argument unpersuasive. The affidavit clearly states facts upon which the

**2.** The evidence presented by three FBI agents at a suppression hearing was uncontroverted.

Crenshaw did not testify.

issuing magistrate could conclude that the pat-down search was based on either consent or a reasonable suspicion that Crenshaw was armed. Even if the issuance of the warrant were somehow faulty, the error is harmless. The only evidence obtained from Crenshaw's motel room was a handgun similar to one used in the robbery. Given the weight of the Government's other evidence,[3] we cannot say there is a reasonable possibility that the error in admitting the handgun, if there was any, materially affected the verdict. See *United States v. Valle-Valdez,* 554 F.2d 911, 915 (9 Cir.1977).

Both Crenshaw and Gordon argue that the district court should have declared a mistrial for prosecutorial misconduct because of (1) statements by the prosecutor during trial and (2) admission of photo identifications of Crenshaw and Gordon by bank employees. ·

■ Reversing a trial court's decision not to grant a mistrial for improper comments by the prosecutor is appropriate only if the comments are "so gross as probably to prejudice the defendant" and any resulting prejudice is not "neutralized" by the court's instructions. *United States v. Potter,* 616 F.2d 384, 392 (9 Cir.1979), *cert. denied,* 449 U.S. 832, 101 S.Ct. 101, 66 L.Ed.2d 37 (1980). The prejudicial effect of the prosecutor's statements in this case appears minimal and, in any event, was neutralized by the court's limiting instructions.

■ Shortly after the robbery and again a week before trial, two bank employees picked Crenshaw's and Gordon's pictures out of a photo lineup of a dozen pictures. On the morning the trial began the prosecutor informed these witnesses that the men they had earlier picked would be present in the courtroom at the defendants' table. The court made a pretrial ruling that these comments of the prosecutor so tainted the reliability of later identifications that no eyewitness identification at trial would be allowed. At the trial the witnesses were at no time asked to identify the defendants in the courtroom as the robbers. They were asked, however, to pick again from the photo lineup the pictures of the robbers they had previously picked with no coaching. Appellants argue that this was tantamount to an in-court identification. We cannot agree. Any misconduct of the prosecutor did not affect the reliability of the identifications already made. Since the initial photo picks were not affected by the later misconduct of the prosecutor, it cannot be said that the court abused its discretion in permitting a repeat at trial of the photo identifications.

■ Crenshaw next argues that certain testimony should have been excluded because its prejudicial effect outweighed its probative value.[4] "The judge's determination of this balance is given great deference and this court will reverse it only where there is an abuse of discretion." *United States v. Larios,* 640 F.2d 938, 941 (9 Cir. 1981) and cases there cited. See also *United States v. Casanova,* 642 F.2d 300, 301 (9 Cir.1981), *cert. denied,* 454 U.S. 899, 102 S.Ct. 401, 70 L.Ed.2d 215 (1981). We find no abuse of the trial court's discretion.

■ Finally, Gordon argues that even if each individual error considered separately does not require a reversal, the cumulative effect of the errors was so prejudicial that he was deprived of a fair trial. If evidentiary errors and prosecutorial misconduct are "more probably harmless than not", this court should affirm. *United States v. Berry,* 627 F.2d 193, 201 (9 Cir.1980), *cert. denied,* 449 U.S. 1113, 101 S.Ct. 925, 66 L.Ed.2d 843 (1981). Considering the case as a whole, we find that Gordon was not sig-

---

3. The evidence included three eye witness identifications of Crenshaw by bank employees, a spelling error on a handwriting example matching an error of the name given when filling out safe deposit box forms prior to the robbery, and Crenshaw's possession of a jacket matching the description of the jacket worn by one of the robbers in the holdup.

4. The evidence objected to includes (1) a picture of the getaway airplane, (2) receipts for the purchase of gasoline for the getaway airplane, (3) statements of an FBI agent as to the arrest of Crenshaw, and (4) a letter written by defendant Crenshaw to defendant Lehman.

nificantly harmed by any cumulative lingering prejudice from purported errors and prosecutorial misconduct. Moreover, additional evidence against Gordon includes three clear fingerprints left by one of the robbers at the bank. This court has held that fingerprint evidence alone is sufficient to convict. *United States v. Scott,* 452 F.2d 660 (9 Cir.1971).

### III. *Lehman Appeal*

#### A. *Contentions of Appellant*

Lehman contends that the district court erred in (1) refusing to admit defense evidence that an unindicted person had planned the robbery; (2) admitting evidence of three prior bank robberies, but (3) rejecting evidence offered by the defense to rebut it; (4) refusing to order a prosecution witness to produce photographs of the getaway scene; (5) refusing defense evidence to explain Lehman's possession of large amounts of cash when arrested; (6) permitting a prosecution witness to testify and refusing to permit a defense witness to testify by reason of an exclusion order; (7) attaching a reimbursement condition to a writ of habeas corpus for a defense alibi witness; (8) permitting testimony by an undisclosed alibi witness; and (9) permitting the prosecution to confuse the jury with respect to the burden of proof.

#### B. *Court's Refusal to Admit Defense Testimony*

It is well settled that a district court has broad discretion in admitting or excluding evidence. See, *e.g., United States v. Brannon,* 616 F.2d 413 (9 Cir.1980), *cert. denied,* 447 U.S. 908, 100 S.Ct. 2993, 64 L.Ed.2d 858 (1980). With respect to most of the alleged errors we have no difficulty in concluding that there was no abuse of the court's discretion. We are concerned, however, with the rejection of the testimony of Danny Mack Martin that he planned the robbery, combined with the admission of evidence of three prior bank robberies committed by Lehman showing similarities to the robbery in this case.

Pursuant to Rule 404(b), Federal Rules of Evidence, the district court permitted the Government, over defendant's objection, to present evidence of three bank robberies committed in 1975 and 1976. As the Government states, the evidence was admitted "to show identity and opportunity for common scheme or plan." The court applied the standards set forth in *Parker v. United States,* 400 F.2d 248, 252 (9 Cir. 1968), *cert. denied,* 393 U.S. 1097, 89 S.Ct. 892, 21 L.Ed.2d 789 (1969). In *Parker* the court held that, "Proof of conduct similar to that charged, which is peculiar, unique, or bizarre, is admissible to tend to prove identity." The court noted further that "[p]roof of other crimes has likewise been held admissible to show a common scheme, plan, design, system. . . ." The record indicates that the trial judge carefully considered each prior robbery and its similarities to the robbery in this case. We conclude that the court did not abuse its discretion in admitting this evidence.

Lehman offered evidence to show that Danny Mack Martin had planned the robbery. Prior to trial, Lehman moved for the issuance of a writ of habeas corpus *ad testificandum,* pursuant to 28 U.S.C. § 2241(c)(5), to obtain Martin's presence as a witness at the trial. In denying the issuance of a subpoena, the trial judge said in part: "I can't see any relevance to that testimony of Mr. Martin, so I am going to deny that subpoena."

Crenshaw was called as a witness for the defense. During direct examination, counsel asked him if he knew Danny Mack Martin. Counsel for the Government objected to "any questions about Mr. Martin." The objection was sustained. Appellant argues that Crenshaw's testimony that Martin was the person who set up the robbery was relevant and should have been permitted.

Finally, at the conclusion of the trial, Lehman offered an affidavit of Danny Mack Martin, in which Martin took credit for planning the bank robbery and stated that "Mr. Crenshaw and another man named Gordon robbed the Belfair bank," and to the "best of my knowledge, Dennis

Lehman had nothing whatsoever to do with the Belfair bank robbery." The affidavit was excluded as irrelevant.[5]

The Government argues that "Lehman was charged with *aiding and abetting*[6] the robbery, not its planning," and that "the Government's proof at trial established that the defendant's role in the robbery was piloting the getaway plane used by the two men who actually robbed the bank." The Government relies upon the court's identification of "the very simple issue" in the case, i.e., "The defendant either flew that airplane out of Kitsap County or he didn't." The Government claims that it "never sought to prove that the defendant masterminded or planned the robbery" and notes that the district court "reached the conclusion that it did not matter who planned the robbery."[7]

■ The indictment did not specify the manner in which Lehman "aided and abetted" the robbery; nor was the term limited in any way in the court's instructions to the jury. The court properly instructed the jury:

In order to aid and abet another to commit a crime it is necessary that the accused willfully associate himself *in some way* with the criminal venture, and willfully participate in it as he would in something he wishes to bring about; that is to say, that he willfully seek by *some act or omission* of his to make the criminal venture succeed. [Emphasis added].

This would include participation in the planning of the crime.

■ On appeal the Government would draw a distinction between evidence of similarities between this and prior robberies to show a "common plan" and evidence to show participation in the plan of this particular robbery. Unfortunately, however, counsel for the Government did not recognize this distinction in his argument to the jury. At the outset of an extended argument detailing similarities between the robbery in this case and the prior robberies committed by Lehman, counsel said:

The reason I am going to give you the evidence about the bank robbery is because that shows the similarity between this bank robbery and Mr. Lehman's MO, the way he robs banks, it shows that there was a particularly unique MO used, and Mr. Lehman was the man who was behind it.

In denying a motion for acquittal at the close of the Government's case, the court responded to Lehman's counsel in part as follows:

In view of the prior acts and conduct, one of which is identical, committed by your client, [the jury] can very well draw the inference, a reasonable inference that he was not only there, but he planned it. They can draw all reasonable inferences from the evidence before them, and there it is. So I don't think there is any question they have proved a prima facie case,

---

5. Lehman also offered proof of a bank robbery in Silverdale, Washington, committed by Martin a few months before Belfair, as evidence that Martin had played the role assigned to Lehman. Appellant contends that Martin's bank robbery *modus operandi* was manifest in the Silverdale robbery and this evidence should have been admitted, particularly in view of the admission of three prior robberies by Lehman several years earlier.

6. Title 18 U.S.C. § 2(a) provides: "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

In *United States v. Barnett,* 667 F.2d 835, 841 (9 Cir.1982), this court defined "aiding and abetting" as follows:

"Aiding and abetting, as used in 18 U.S.C. § 2, means to assist the perpetrators of a crime." *United States v. Lane,* 514 F.2d 22, 26 (9th Cir.1975). *See Nye & Nissen v. United States,* 336 U.S. 613, 620, 69 S.Ct. 766, 770, 93 L.Ed. 919 (1949). An abettor is one "who, with *mens rea,* ... commands, counsels or otherwise encourages the perpetrator to commit the crime." Perkins, *Criminal Law,* at 645 (2d ed. 1969).

7. The Government argues further that its "case focused upon whether the defendant *aided and abetted* the bank robbery by *piloting the getaway plane,*" and that the evidence of the "prior bank robberies was introduced to show that when he robbed banks, he robbed them in this manner."

it is there, and the jury could believe it very well that he was not only there, he probably planned it, based on the evidence they have before them.

The jury could reasonably have inferred and concluded from the evidence of the prior bank robberies, the argument of counsel, the instructions, and comments of the trial judge that Lehman was guilty of aiding and abetting Crenshaw and Gordon because he planned the robbery.

We recognize that a motion for a subpoena to produce a witness pursuant to Fed.R. Crim.P. 17(b) is addressed to the sound discretion of the trial court, see, e.g., United States v. Martin, 567 F.2d 849, 853 (9 Cir. 1977), and that the defendant must make a "satisfactory showing . . . that the presence of the witness is necessary to an adequate defense." In view of the trial court's initial conclusion that the question of who planned the robbery was not an issue in the case, the rejection of the motion for a subpoena, standing alone, might well be within the sound discretion of the trial court. However, after the Government had produced evidence from which the court concluded that the jury might "reasonably infer" that Lehman "planned" the robbery, appellant twice offered evidence that Martin did in fact plan the robbery.

This court recognized in United States v. Brannon, supra, 616 F.2d at 418, that "A defendant is entitled to prove his innocence by showing that someone else committed the crime." We concluded under the facts of that case, however, that the district court had not abused its discretion in excluding certain photographs of a third person, noting that a court may exclude relevant evidence if the evidence is likely to confuse the issues or mislead the jury. Id. at 418.

The Government contends that the evidence here was irrelevant and, if relevant, was likely to confuse the issues and mislead the jury. The evidence of Martin's participation in planning the robbery was rejected as irrelevant on the ground that the question of who planned the robbery was "not at issue" and the "simple issue" was whether or not Lehman flew the plane out of Kitsap County. As noted above, however, the evidence was by no means limited to that relating to the flight and its comparison with the prior robberies. Rather the Government presented extensive evidence comparing in minute detail the three prior robberies committed by Lehman and the robbery at issue here, and counsel for the Government devoted a substantial part of his argument to this comparison.[8]

The court might properly have concluded that the evidence regarding Martin's participation was irrelevant if the issues had been limited as initially suggested. But after the Government presented proof from which the court concluded that the jury might "reasonably infer" that Lehman planned the robbery, Lehman should have been permitted to introduce evidence to rebut that inference. The jury might have concluded that Lehman was guilty because he planned the robbery, whether or not he was the pilot of the getaway plane.

### IV.  Conclusion

We affirm the convictions of Crenshaw and Gordon and reverse the conviction of Lehman and remand for a new trial.

---

8. For example, in comparing the phone call of the "attorney", counsel said in part:

> Somebody made that call. Now you saw Crenshaw testify, and you saw Gordon testify, do you think it is reasonable to believe that either Crenshaw or Gordon called up the bank with that story, and convinced the bank manager that they were an attorney, wanting to dissolve a partnership with two clients? No, probably that was Mr. Lehman, the one here on the left, from what you have seen, you can be I think confident that it was not Crenshaw or Gordon.